1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF SOUTH CAROLINA
2  COLUMBIA DIVISION
   --------------------------------------------X
3  MARK T. COX AND RIDDICK S. RICHARDSON, ON
   BEHALF OF THEMSELVES AND ALL OTHERS
4  SIMILARLY SITUATED,

5                          Plaintiffs,

6          -against-

7  TIME WARNER CABLE INC.,

8                          Defendant.

9  --------------------------------------------X
   FRED W. ELMORE, ON BEHALF OF HIMSELF AND ALL
10 OTHERS SIMILARLY SITUATED,

11                         Plaintiff,

12         -against-

13 TIME WARNER CABLE INC.,

14                         Defendant.
   --------------------------------------------X
15

16         80 Pine Street
           New York, New York 10005
17         9:00 a.m.

18 Deposition of Christine Dzujna, a 30(b)(6) witness for the

19 Defendants, taken by the Plaintiffs

20 Pursuant to Article 31 of the Civil Practice Law & Rules of

21 Testimony, and rule 30(b)(6) held at the above-mentioned time

22 and place, before Melissa A. Humenny, a Notary Public of the

23 State of New York.

24

25

2

```
1    A P P E A R A N C E S

2

3    HOPKINS LAW FIRM
          Attorneys for Plaintiffs
4    12019 Ocean Hwy P.O. Box 1885
     Pawleys Island, South Carolina 29585
5        BY:  William E. "Bill" Hopkins, Jr.

6        JANET, JENNER, & SUGGS, LLC
          Attorneys for Plaintiffs
7          500 Taylor Street
     Columbia, South Carolina 29201
8    BY: FRANCIS M. "BRINK" HINSON, IV

9

         CAHILL, GORDON, & REINDELL LLP
10        Attorneys for Defendants
          80 Pine Street
11   NEW YORK, NEW YORK 10005
          BY: JONATHAN D. THEIR

12

13        CAHILL GORDON AND REINDELL LLP
          Attorneys for Defendants
14        80 PINE STREET
     NEW YORK, NEW YORK 10005
15        BY: MARGARET MCPHERSON

16

17        CAHILL, GORDON AND REINDELL LLP
     Attorneys for defendants
18   80 PINE STREET
     NEW YORK, NEW YORK 10005
19   BY: MICHAEL QUINN

20

21

22

23

24

25
```

1    IT IS HEREBY STIPULATED AND AGREED, by and between the
2    attorneys for the respective parties hereto, that:
3    All rights provided by the C.P.L.R., and Part 221 of the
4    Uniform Rules for the Conduct of Depositions, including the
5    right to object to any question, except as to form, or such
6    other irregularity that would be waived if not interposed, or
7    to move to strike any testimony at this examination is
8    reserved.
9    The failure to object to any question, or to move to strike
10   any testimony at this examination, except as to form or other
11   irregularity shall not be a bar or waiver to make such motion
12   at, and is reserved to, the time of trial of this action.
13   An attorney shall not interrupt the deposition for the
14   purpose of communicating with the deponent unless all parties
15   consent or the communication shall be stated clearly for the
16   record. This deposition shall be sworn to by the witness being
17   examined before a Notary Public other than the Notary Public
18   before whom this examination was begun, but the failure to do
19   so or to return the original of this deposition to counsel
20   shall not be deemed a waiver of the rights provided by Rule
21   3116 of the C.P.L.R. and shall be controlled thereby.
22   The filing of the original of this deposition is waived.
23   IT IS FURTHER STIPULATED, that a copy of this examination
24   shall be furnished to the attorney for the witness being
25   examined without charge.

1    CHRISTINE DZUJNA, after having first been duly sworn by a

2    Notary Public of the State of New York, was examined and

3    testified as follows:

4    EXAMINATION

5    BY MR. HOPKINS:

6        Q.  State your name for the record, please.

7        A.  Christine Dzujna.

8        Q.  State your address for the record, please.

9        A.  10-78 Cove Road Stamford, Connecticut, 06902.

10       Q.  Ms. Dzujna, how are you?

11       A.  Good, how are you?

12       Q.  My name is Bill Hopkins and I represent some folks in

13   South Carolina who brought a claim against

14   Time Warner Cable and Brink Hinson, another lawyer from

15   South Carolina is on the phone and he also represents some

16   folks.

17           Have you had your deposition taken before?

18       A.  I have.

19       Q.  Okay. Then you understand the process. These cases are

20   pending in South Carolina and there is one thing in South

21   Carolina rules that are a little unique that I need to tell

22   you before we start.

23           In the South Carolina federal court, once you are

24   sworn into oath, you're then unable to confer with your

25   counsel, so if you have any questions or need any

1   clarification about anything, if you would please ask me and

2   I'll try to clear it up.

3       If you were to have conversations with your counsel

4   about the substance of your deposition, I would be entitled to

5   ask you about those, do you understand that?

6       A.  I do.

7           MR. THIER:   So to to be clear, if you need

8           to speak to me, you can, but Mr. Hopkins will be

9           allowed to inquire. But feel free to speak to me

10          if you need to.

11          THE WITNESS: Okay.

12      Q.  How long have you worked for Time Warner,

13  Ms. Dzujna?

14      A.  Almost 17 years.

15      Q.  You work in the New York City office?

16      A.  I do.

17      Q.  Is your position still the senior director of

18  compliance and legal affairs?

19      A.  Yes.

20      Q.  How long have you been in that position?

21      A.  Approximately four years.

22      Q.  To whom do you report?

23      A.  To our chief ethics and compliance officer.  Deputy

24  general council. Do you want his name?

25      Q.  Sure.

1    A.  Jeff Zimmerman.

2    Q.  Is Mr. Zimmerman located at the same New York office

3  that you are?

4    A.  Yes.

5    Q.  Do any people report to you?

6    A.  Yes, I have two paralegals that report to me.

7    Q.  Are you an attorney?

8    A.  I am not.

9    Q.  Did you receive a law degree?

10    A.  I did not.

11    Q.  What did you do for Time Warner Cable before you

12  became the senior director of compliance and legal affairs?

13    A.  My prior position was director of compliance and legal

14  affairs.

15    Q.  Did your duties change substantially or significantly

16  when you became the senior director?

17    A.  No. I do more ethics and compliance work in our ethics

18  department than I did before, but there's no substantial

19  changes.

20    Q.  What type -- when you say "ethics work" can you expand

21  on that a little bit for me?

22    A.  We have a -- we call it our compliance program and it

23  was created pursuant to the U.S. sentencing guide  lines and

24  we have a standards of business conduct that governs the way

25  that our employees conduct themselves in their job and so we

administer those standards, we do training, if there are

potential violations of the standards we do investigations. We

teach the employees to be ethical and to report issues or

problems to us so that we can handle them.

    Q.  Is this throughout the company or only for management?

    A.  For all employees.

    Q.  Who conducts the training?

    A.  I do so in conjunction with my boss and we also

create online training courses.

    Q.  Is Mr. Zimmerman a lawyer?

    A.  He is.

    Q.  Have you ever been to South Carolina?

    A.  Yes.

    Q.  I'm sorry, I should have clarified -- for work related

reasons?

    A.  I was recently there for a conference that we are paid

for, but it wasn't directly associated with my job.  It was a

leadership conference.

    Q.  Which city in our fine state did you get to get to?

    A.  It was in Columbia.

    Q.  What are your duties and responsibilities,

Ms. Dzujna, as the senior director of compliance and legal

affairs?

    A.  So as I said, the main portion of our responsibilities

relate to the ethics and compliance function, but I also have

1  other responsibilities some that I've had for a number of

2  years, including I manage these two paralegals and I've always

3  had, for the last ten years or so, some staff that have

4  reported to me that I've managed.

5      I work closely with our chief privacy officer on

6  privacy issues. I have helped roll out our subscriber

7  agreement, any modifications to the agreement to our

8  subscriber base.

9      I also manage a program that deals with online

10  copyright infringement issues. I've handled escalated

11  subscriber complaints and other general support duties that

12  the law department might need.

13      Q.  Okay. Thank you I appreciate that.

14      I want to focus today, as you probably know, on  two

15  of those areas, the arbitration and the subscriber complaints.

16  You indicated that you have had your deposition taken before,

17  have you ever had your deposition taken before in connection

18  with arbitration proceeding?

19      A.  No.

20      Q.  In any of the lawsuits in which you've had your

21  deposition taken, did any of those involve the subject of

22  arbitration?

23          MR. THIER: Just to object to form in that

24          your  question implies she's testified more than

25          once which is not in the record.

1    Q.  How many times would you estimate that you've

2    testified?

3    A.  Just once.

4    Q.  In that lone suit, was that in New York, or in another

5    state?

6    A.  I don't know where the case was based, but I was

7    deposed in Stamford, Connecticut.

8    Q.  Okay. A case involving your employer,

9    Time Warner?

10   A.  Yes.

11   Q.  Were you testifying like you are today as the

12   30(b)(6) witness, a corporate representative, or just a

13   witness for the company?

14   A.  30(b)(6).

15   Q.  Did that -- let me just ask you, what did that case

16   involve, do you know?

17   A.  I don't recall the specifics, I know it had to do with

18   our set-top boxes.

19   Q.  How long ago was that?

20   A.  I don't remember the year. I think it was about seven

21   years ago.

22   Q.  First thing I'd like to do we're gonna mark as an

23   exhibit the deposition notice today, if that's okay. I'll let

24   the court reporter mark it and then provide you a copy.

25

1          (Whereupon, the deposition notice was marked as

2          Plaintiff's Exhibit 1 for Identification.)

3     Q.  I'll show this to you, Ms. Dzjuna, this is simply the

4  notice of the 30(b)(6) deposition pursuant to an agreement

5  that John and I reached, you were only going to testify about

6  -- we narrowed down the scope of

7  this -- I was just wondering if you had ever seen this before.

8     A.  I have not seen this before.

9     Q.  Do you understand that you are primarily responsible

10  for administering the -- well, I believe you testified that

11  you were responsible for drafting the subscriber agreement; is

12  that correct?

13     A.  No.

14     Q.  Or played a part in drafting it or just played a part

15  in its distribution?

16     A.  I never played part in the drafting of the subscriber

17  agreement.

18     Q.  I'm assuming lawyers, or the law department at Time

19  Warner did that?

20     A.  Yes.

21     Q.  How did you go about -- or how does Time Warner go

22  about distributing its subscriber agreement?

23          MR. THIER:  And you're saying -- not in the

24          context of a new, modified, revised version,

25          just as a general practice how did they

1          distribute the subscriber agreement?

2               MR. HOPKINS: Right. Thank you, John.

3     Q.  Let's assume that someone first applying -- a new

4  customer applying for services with Time Warner Cable,

5  whatever those services may be, how -- what is your

6  understanding of how the company makes the customer aware of

7  the subscriber agreement?

8     A.  So my understanding is that we provide a copy to the

9  subscriber in the welcome kit that they are given at the time

10 of the installation.

11    Q.  And who provides them that kit -- welcome kit?

12    A.  Whoever's doing the installation. Generally the

13 technician at the local office.

14    Q.  Does Time Warner employ it's own installers or does it

15 contract with a third party for installation?

16               MR. THIER:  Just object to form, it's a

17          compound question, but you can answer.

18    A.  We do both.  We have employees and contractors.

19    Q.  Are the installers or the contractors that

20 Time Warner contracts with, are they given any specific

21 instructions about how to introduce the customer to the

22 agreement?

23    A.  I don't know.

24    Q.  Who trains the installers?

25    A.  Specifically, I don't know.

1    Q. Are the installers required to get a signature from

2    the customer on the subscriber agreement or some other type of

3    acknowledgement that they've received it?

4    A. Our installers are instructed to obtain

5    acknowledgement from the subscriber that they have received

6    the subscriber agreement.

7    Q. When those documents -- where the customer

8    acknowledges receipt of the the agreement, where are those

9    documents maintained, or who gets those documents?

10    A. They are maintained at the local office where the

11    subscriber is provided service.

12    Q. Now, do I understand that Time Warner also makes its

13    subscriber agreement available online; is that right?

14    A. Yes.

15    Q. And explain that to you me, if you can, how is that

16    handled?

17    A. What do you mean by handled?

18    Q. Well, is that in addition to the welcome kit being

19    handed to someone or is that another means by which someone

20    can get Time Warner service online, rather than -- or, what's

21    the purpose of it being online, if the customers are given a

22    hard copy at the time of installation?

23    A. It's just another means for them to get access. We

24    have a page off of our main website that lists -- has a list

25    of some pertinent subscriber documents, like the subscriber

1    privacy agreement, notice, and the subscriber agreement.

2         So it's a supplement. It's another -- I mean,

3    obviously people use the internet to get information and it's

4    a very helpful way for them to get access to the subscriber

5    agreement at any time they want.

6    Q.  Would it be accurate to say, though, that the customer

7    would not have to click on anything acknowledging receipt or

8    that they've read it in order to access the subscriber

9    agreement online, or would they be required to acknowledge

10   receipt?

11        What I'm trying to figure out is does the company have

12   a record somehow of when someone reads it online or accesses

13   it online?

14   A.  The website that I'm talking about, where I make sure

15   that there's always a current version of the subscriber

16   agreement, it's -- it's a website that just houses the

17   agreement for anyone to review at anytime, there's no

18   acknowledging it. It's just available for informational

19   purposes.

20   Q.  And you probably know more about this than I do but

21   you may have heard the term "click through agreements"  or

22   "clickwrap agreements" where someone has to click on a certain

23   button.

24        Does Time Warner Cable utilize any of these?

25   A.  I believe so. I just -- it's just not something that I

1  have been involved in.

2           MR. HOPKINS:  Mark that as an exhibit.

3           (Whereupon an affidavit was marked as

4      Plaintiff's Exhibit 2 for identification.)

5      Q.  Ms. Dzujna, I'm handing you what we've marked as

6  Exhibit 2 which is the affidavit which you've submitted in the

7  Elmore case in connection with the motion to compel

8  arbitration. Are you familiar with this affidavit?

9      A.  Yes.

10     Q.  And that is your signature on page four of the

11  affidavit?

12     A.  Yes, correct.

13     Q.  In paragraph one of your affidavit it says that you

14  administered arbitration opt-out provision. Can you tell me

15  how it is that you administered the arbitration, opt-out

16  provision?

17     A.  When we first created the arbitration opt-out, I

18  worked with some people in our web design group to creat an

19  arbitration opt-out page that would be available to

20  subscribers online and I received on a monthly basis

21  information about everyone who had submitted an opt-out

22  request through that form in that last month, so every month

23  I'd get a new report. And I also -- since the subscribers can

24  also submit that request by mail, that request, if it comes

25  in, comes directly to my office so I maintain those that are

1   mailed in and I keep a record of who's made requests that way.

2   Q.  Okay. Who supplies you the monthly reports of the

3   online opt-outs?

4   A.  Again, it's our web services team. It's just

5   automatically generated to me.

6   Q.  Would you be able to tell by looking at the records of

7   how many folks had opted-out online, say, in the past three

8   five years?

9   A.  Can you clarify what by what you mean by "look at the

10  records?"

11  Q.  Sure. Can you simply pull the monthly reports for the

12  last 36 to 60 months to determine how many people have

13  opted-out?

14  A.  Yes.

15  Q.  Have you done that before today?

16  A.  Yes.

17  Q.  Can you tell me what that number would be or,

18  approximately what that number would be?

19  A.  I'm gonna consult the affidavit.

20  Q.  Okay.

21      MR. THIER:  For everyone's ease, I believe

22      it was contained within the interrogatory

23      responses you have verified.

24  A.  Right. It was. I don't want to guess at the number.

25  Q.  Okay, sure. We'll get to that.

1          MR. HOPKINS:  Why don't we mark that as

2      Exhibit 3.

3          (Whereupon, interrogatory responses were

4      marked as Plaintiff's Exhibit 3 for

5      identification.)

6      Q.  I'll hand this to you, Ms. Dzujna. These are

7  Time Warner's answers to the plaintiffs' interrogatories and

8  my understanding is that you supplied the information that is

9  contained herein?

10     A.  Correct.

11     Q.  I believe it states that, according to your research,

12  from March 1st 2010 to April 17th 2013, 51 customers mailed in

13  opt-out and approximately 1800 opted-out online. I'll let you

14  confirm if I'm reading that correctly.

15     A.  Yes, that's correct.

16     Q.  Would that be on a nationwide basis?

17     A.  Yes all our subscribers have the ability to use  those

18  opt-out mechanisms.

19     Q.  Do you know nationwide how many customers

20  Time Warner has? And I realize you all have different

21  businesses, but let's stick to the cable. Let's say the cable

22  and the internet business.

23     A.  I only know that in total we have about close to 15

24  million I don't know them by business line.

25     Q.  Tell me, if you can, about the change to the

1    subscriber agreement in 2010 that you mentioned in your

2    affidavit, do you recall what the specific changes were that

3    were made in 2010?

4        A.  I don't recall them all since I wasn't involved in the

5    drafting. I do know that is when we added the arbitration

6    opt-out provision because then I was tasked with creating the

7    opt-out mechanisms.

8        Q.  It didn't add the arbitration agreement, only the

9    opportunity to opt-out; is that correct?

10       A.  Yes, correct.

11       Q.  And I believe your affidavit states that the notice of

12   this amendment was put in customer's bills or billing

13   statement; is that right?

14       A.  That's correct.

15       Q.  Were the customers notified in that billing statement

16   of the opportunity at that time to opt-out of the new

17   subscriber agreement?

18       A.  Yes.

19            MR. THIER:   Opt-out of the arbitration

20         agreement within the new subscriber agreement.

21            MR. HOPKINS:  Thank you. Now, that's a

22         better question.

23       Q.  How was that -- do you recall how that was

24   communicated to the customer?

25       A.  So all of our local offices were instructed to put a

1    notice on their bills for one billing cycle that would notify

2    the subscribers that there was a new subscriber agreement that

3    had  -- that had added a new arbitration opt-out provision and

4    provide a link -- a URL to the link where the subscriber

5    agreement was available.

6        Q.  So I understand that it provided them with a link to

7    go to the subscriber agreement, did it specifically say that

8    the amendment that had been made was an opportunity to opt-out

9    of that agreement?

10       A.  I don't recall specifically. It -- it said the

11   agreement had been amended and included an arbitration

12   opt-out. That is what I recall the notice said.

13       Q.  I'm sorry, can you say that again?

14       A.  The notice let customers know that there was an

15   amended subscriber agreement which included an arbitration

16   opt-out provision.

17       Q.  If someone opted out in 2010 but had not taken any

18   steps to opt-out or object to the previous agreement, did Time

19   Warner -- and I'm not asking for what position a lawyer may

20   take, or legal position, but did the company -- would they

21   accept that opt-out?

22       A.  Can you please clarify?

23       Q.  Sure. If someone -- the previous agreement had no

24   opt-out provision, no opportunity to opt out; is that correct?

25       A.  Correct.

1    Q.  Did anyone ever try to, to your knowledge, send any

2    communication or opt-out of or disagree with or opt-out of the

3    arbitration provision before the link was  put on the website

4    to allow them to opt-out?

5    A.  Not to my knowledge.

6    Q.  Do you know whether any other material revisions were

7    made to the subscriber agreement in 2010 other than the

8    ability opt-out of the arbitration, provision?

9    A.  I'm not in a position to form an opinion as to the

10   materiality of any revision to the agreement.

11   Q.  As we sit here today, can you remember any revisions

12   other than the opt-out to the arbitration  provision?

13   A.  Not specifically. I know various revisions were made

14   but, again, because I wasn't involved in the drafting I

15   couldn't speak directly to those.

16   Q.  Did -- to your knowledge, did

17   Time Warner Cable ever discontinue providing service to anyone

18   who elected to opt-out of the arbitration  provision?

19   A.  I have no information about that. I don't know.

20         MR. THIER:   As a result of someone's

21      decision to opt-out, did they ever discontinue

22      service.

23         MR. HOPKINS: Right.

24   A.  I don't know.

25         MR. HOPKINS: Mark this please.

1              (Whereupon a subscriber agreement was marked

2         as Plaintiff's Exhibit 4 for identification.)

3      Q.  Ms. Dzujna, I'm handing you what was one of the

4   exhibits of your affidavit filed with the court and it is my

5   understanding that it's the most recent subscriber agreement;

6   is that correct?

7      A.  Yes it does appear to be.

8      Q.  Would be it accurate that Time Warner has the right to

9   amend this at any time, to make any revisions it wants to?

10     A.  We do state that, yes, in the subscriber agreement.

11     Q.  And in fact, Time Warner has, in the past, amended it

12  from time to time, haven't they?

13     A.  Correct.

14     Q.  I believe that on page six, paragraph eight is that

15  the provision that -- where Time Warner retains the right to

16  amend these agreements by amending the online version?

17     A.  It definitely says that. Again, not be being involved

18  in the drafting. I don't --

19     Q.  Have I read that correctly? Is that your understanding

20  of what that paragraph means?

21     A.  Yes.

22     Q.  The way I read the agreement in paragraph 8B if there

23  is a change -- if Time Warner makes a change to the subscriber

24  agreement, the only thing that the customer would have to do

25  to acknowledge or be bound by that change is to continue

1  receiving services?

2      A.  Yes, that is my understanding.

3      Q.  If you turn to page nine, let's talk about the

4  arbitration agreement a little bit. The fist paragraph states

5  that each of the parties, that being,

6  Time Warner and customer, agrees to use the

7  American Arbitration Association. Do you have any dealings

8  with the American Arbitration Association?

9      A.  Not in connection with this issue.

10     Q.  Okay. Can you tell me in what manner you may have some

11  relation or connection with them?

12     A.  Wholly separate from this issue I mentioned earlier

13  that one of my responsibilities is to manage our online

14  copyright infringement program. And we have a program right

15  now where subscribers are able to appeal complaints -- I'm

16  sorry, complaints that are submitted about them about

17  potential online infringement and the American Arbitration

18  Association was hired by various parties to this agreement to

19  make decisions with regards to those appeals.

20     Q.  Where would the complaints have been initiated? I

21  understand that the triple A is hearing the appeal, who would

22  have been the -- or what would have been the lower tribunal

23  from which an appeal would be taken?

24     A.  I'm not sure I understand the question. There's no

25  lower tribunal.

1      Q.  I see. In what manner, or what form would the
2  complaint be made of copyright infringement? Just a letter? Or
3  some other action?
4      A.  So, content owners who believe that someone has
5  infringed their copyright submit complaints to internet
6  service providers like us. We forward those our customer and
7  then the customers, if they want to dispute that complaint,
8  have the ability to do so.
9      Q.  Okay. So Time Warner is not the initiating party of
10 the complaint?
11     A.  No.
12     Q.  If either Time Warner or a customer submits a matter
13 to the triple A, who at Time Warner would be the person
14 responsible for receiving and dealing with that matter?
15             MR. THIER:   Are you still in the world of
16        copyright issues --
17             MR. HOPKINS: No, I'm sorry --
18             MR. THIER:  -- or subscriber agreements.
19             MR. HOPKINS: Subscribers, customers.
20     Q.  If a complaint is initiated by either either party,
21 who who would be the designated person at
22 Time Warner, to your knowledge that would have responsibility
23 for the arbitration?
24     A.  I don't know who would be served. We have lawyers in
25 our department that handle cases that come through whether

1    through a regular court system or arbitration.

2       Q.  Okay. That would not be handled at the local or

3    regional level though, would it?

4       A.  I don't know. I don't believe so.

5       Q.  Do you know, for instance, let's just say,

6    hypothetically a customer in Columbia, South Carolina is mad

7    for some reason. They fire off something to the American

8    Arbitration Association, being a layperson, they just send the

9    copy to the local office in Columbia, or to the South Carolina

10   office. Do you know who at

11   Time Warner the South Carolinas folks would forward that to?

12      A.  I don't.

13            MR. THIER:  And when you say you don't, you

14         don't know the particular person, but do you know

15         which department it would go to.

16      A.  It should come to the law department.

17      Q.  And that is what I'm trying to find out.

18            Is there someone outside of the legal department, who

19   is tasked with either record-keeping or maintaining or

20   coordinating arbitration matters outside of the law

21   department?

22      A.  Not that I'm aware of.

23      Q.  Did you play any role at all in drafting the

24   arbitration provision, that is paragraph 15, that is within

25   the subscriber agreement?

1    A.  I did not. Probably the only thing I added was the

2  room number in the address since that is my office number.

3    Q.  So you were not asked to provide input?

4    A.  I was not.

5    Q.  When a lawsuit, or if a lawsuit, is filed by a

6  subscriber against Time Warner, would it be common -- or

7  ordinary course of business for the legal department to come

8  to you to determine if that person opted-out of the

9  arbitration provision?

10    A.  Yes, I do carry out the received requests from our

11  lawyers for me to check whether someone has submitted an

12  opt-out -- an arbitration opt-out request.

13    Q.  When you get these reports every month about the

14  opt-outs, what do you do with them? Do you simply maintain

15  them or file them, or do you forward them on to other people?

16    A.  I maintain them.

17    Q.  Do you summarize them, prepare any type of report that

18  you send to someone else to let them know about the numbers?

19    A.  No.

20    Q.  Do you ever have any direct interaction or dealing

21  with any customers?

22    A.  Fairly infrequently.

23    Q.  Can you tell me on that infrequent basis, how would it

24  be that a customer would communicate with you?  Would you --

25  in other words, are you a designated person to send a call to

1  or do they call your number by accident? Just tell me

2  something that you can remember, if you can?

3     A.  We do have people in the law department that are the

4  designated contacts for handling customer concerns.

5  Sometimes -- I've been with the company for a long time and

6  people know me so they will just hand out my number if they

7  can't help them and they hope that I can.

8     Q.  You do seem like a person who can appease an angry

9  customer.

10     A.  Thank you. And sometimes things are escalated and

11  someone submits a report to me or someone else in the

12  department comes to me looking for some advice and maybe I

13  would get involved talk to the customer, but it's pretty

14  infrequent.

15     Q.  Do you have the authority to resolve customer

16  complaints from time to time?

17     A.  I do, though I generally, especially if it's

18  escalated, will consult with a lawyer to make sure it's  in

19  line with how we want to handle the issue.

20     Q.  Tell me what you mean by escalated.

21     A.  All I mean by that is if the local office can't

22  resolve it, if they're just not getting anywhere with the

23  customer, if the customer demands to speak to the law

24  department, then it gets escalated up to us.

25     Q.  Do you ever have any dealings or interactions with the

1  state or local offices in regards to solving customer

2  complaints?

3      A.  You mean in connection -- when you said state or local

4  office you mean Time Warner Cable --

5      Q.  Yes, ma'am, in other words let's say and angry

6  customer demands to speak to the law department so they

7  forward it to you, hoping you can work your charm to calm them

8  down, do you ever then call the state office or the local

9  office to discuss that complaint, or do you just deal with the

10 lawyer and the customer?

11     A.  I sometimes receive those, I generally will forward

12 them on to someone else to handle it because it's not a

13 regular part of my job responsibilities these days and we have

14 a great team in the law department that handles that.

15     Q.  Have you ever testified for Time Warner Cable in an

16 arbitration proceeding before the triple A or any other

17 tribunal?

18     A.  No.

19     Q.  Do you know whether Time Warner has, or if so, how

20 often it has initiated an arbitration proceeding against a

21 customer or consumer?

22     A.  I don't have details on how often that happens.

23     Q.  Do you had have any knowledge as to whether it ever

24 has happened?

25     A.  Yes.

1           MR. THIER:  I'm sorry, that Time Warner

2      Cable has initiated proceedings as a plaintiff

3      against a subscriber in an arbitration.

4           MR. HOPKINS:  Yes, sir.

5      A.  So I mean I know that there have been some situations

6   where arbitration has been a potential method of resolution, I

7   don't have details about who initiated. I don't believe any of

8   those have come to conclusion so I'm just not involved

9   directly in managing those cases.

10      Q.  Do you have any involvement at all in those, as to the

11   initiation or the decision making, or appearances before the

12   tribunal or anything of that nature?

13      A.  No.

14      Q.  What about if a customer initiates an arbitration

15   against Time Warner, are you asked -- do you have any

16   involvement in that? Are you ever asked to participate or

17   coordinate or testify?

18      A.  No.

19      Q.  And again, are you aware of anyone outside the legal

20   department that may have some type of activity in the

21   arbitration process?

22      A.  I am not.

23      Q.  One of the provisions in the subscriber agreement that

24   we looked at, number eight, says that Time Warner can not only

25   amend the subscriber agreement, but it can change prices. Are

1    you familiar with the manner in which Time Warner Cable would

2    notify its customers of changes in prices?

3        A.  I am not involved in that, no.

4            MR. THIER:  I'm sure your answer would be

5            the same, but is it the same -- because I don't

6            think you want it to come back --whether it's

7            internet service pricing or video service

8            pricing, or phone service pricing, you're not

9            involved in any of those.

10            THE WITNESS:  That is correct.

11       Q.  Just for way of example, my client, Mr. Elmore, is

12    complaining about an internet modem which he had used for free

13    for many years, and then he began getting charged $3.95 per

14    month. Would you have had any role in the -- in either the

15    decision, or how to notify customers that they would start

16    being charged for that piece of equipment?

17       A.  No.

18       Q.  I want to speak to you a moment about -- you talked

19    earlier about training -- let's talk about training of

20    lower-level employees or fist line folks communicating with

21    the customers on a daily basis.

22            If a customer or consumer calls in to voice a

23    complaint either about pricing or service, is that the type of

24    ethics training that you provide? Would be it in regards to

25    those types of communications?

1    A.  No, we don't talk about how to handle customer

2   complaints in our ethics training.

3    Q.  I see. What type of problems or ethics training is

4   your training focused on?

5    A.  So, the standards of business conduct, which is the

6   basis for our training covers a variety of issues.  It talks

7   about things like not taking bribes from vendors.

8    Q.  I see.

9    A.  Not cooking the books, not altering the company

10   records, the appropriateness of taking or giving gifts to

11   vendors you might be doing business with.

12    Q.  I see. Okay. And would the same be true if a customer

13   called in about a question about the arbitration agreement or

14   the arbitration process your  area of responsibility would not

15   include training those telecommunications folks on how to talk

16   to customers about the arbitration process or arbitration

17   agreement?

18    A.  You confused me a little bit when you started the

19   question with "would the same be true."

20    Q.  My understanding is your ethics training is really is

21   more -- it sounds to me like it's really focused on not

22   breaking the law, statutes or regulations regarding legal

23   compliance issues, not customer complaints.

24    A.  I am not involved at all in training any local

25   personnel on how to work with customers.

1    Q.  Do you know whether anyone at Time Warner Cable is --

2    is there a department or a person who would train the

3    telecommunication folks on discussing an arbitration agreement

4    or arbitration process with an angry customer?

5    A.  We do have a training department that helps develop

6    training for local personnel. There is no training that

7    they've developed specifically on the arbitration opt-out

8    provision.

9    Q.  So there are no written materials or brochures or a

10   section of a handbook that tells the person if someone calls

11   about arbitration this is -- these are the points you should

12   make, these are the points you should highlight?

13   A.  Not that I'm aware of.

14          MR. THIER:  Just to be complete, did you

15          look for such materials in the context of our

16          request in this lawsuit.

17          THE WITNESS: Yes.

18   Q.  And I'm gonna get to that area, too. I'm gonna get to

19   that in a little bit -- we can just go to it right now.

20          I know that you were designated as the 30(b)(6)

21   representative and I've read your affidavit that you have

22   looked through some business records. What exactly  did you do

23   to -- why don't we break it down.

24          First, what did you do to prepare your affidavit, and

25   then I'll ask you what you did to prepare for your deposition.

1     A.  So I reviewed the affidavit that was presented to me

2  in draft form for accuracy and made some changes where

3  appropriate. And I -- where necessary, reached out to local

4  personnel to verify any information that I needed to.

5     Q.  I know that you attached your affidavits and documents

6  related to Mr. Elmore, some documents related to his service,

7  did you get that from the folks in South Carolina?

8     A.  Yes.

9     Q.  Is there a particular contact person you had in South

10 Carolina that you deal with?

11    A.  I don't recall who I contacted on this particular -- I

12 don't regularly reach out to people on these types of issues

13 so I don't have a list of go-to contacts at that location but

14 -- yeah, I don't recall the name of the person who helped

15 collect these materials.

16    Q.  How about the the answers to interrogatories and the

17 information contained therein regarding the opt-outs, was that

18 all in your offers, or did you have to reach out to another

19 department or another person to help you with that?

20    A.  Can you clarify? Are you talking specifically about

21 the numbers of people who opted-out whether or online or --

22    Q.  That's a good question. Did you have to reach out to

23 anyone in any other department for any of the information that

24 you gathered in connection with your being a 30(b)(6) witness?

25    A.  Yes.

1    Q.  Why don't we discuss South Carolina first. You don't

2    remember their name?

3    A.  I don't.

4    Q.  Let's go past that, who else did you have to reach --

5    or did you reach out to to look for or obtain information?

6    A.  I reached out to our training department to determine

7    whether they had helped develop materials for local personnel

8    about -- specifically, about the  arbitration opt-out

9    provision, and they had none.  I reached out to someone in our

10   customer care group to see if they had provided instructions

11   to local customer service reps specifically about the

12   arbitration opt-out and we found none.

13        I also reached out to an area V.P. of operations in

14   South Carolina to ask if they had ever seen any arbitration

15   cases from subscribers in her office.

16   Q.  And what was her answer?

17   A.  She had not.

18   Q.  Do you know who that V.P. was?

19   A.  Her name Charlene Keys, K-E-Y-S.

20   Q.  Who was the person in the training department that you

21   spoke to?

22   A.  I'm sorry, I can't remember her name.

23   Q.  Was in she in New York, in your office?

24   A.  She's based in our Charlotte corporate office.

25   Q.  And the customer care person, do you remember the name

1   of that person?

2       A.  I'm terrible with names, I don't remember.

3       Q.  Where was her office located?

4       A.  It was a he. And I'm afraid I don't recall exactly

5   where he's based.

6       Q.  Do I understand that they told you, essentially, that

7   the customer care folks -- that they did not provide any

8   training or written materials regarding questions about the

9   arbitration provision or the arbitration process?

10      A.  Well, with to regard training materials, again I

11  contacted the training department and they had no record of

12  any prepared training for local techs or local personnel that

13  specifically addressed the arbitration  opt-out.

14      Q.  The form that the installer gets from

15  Time Warner, is that just a signature to acknowledge that the

16  customer received the subscriber agreement, or that they have

17  read it, or do you know?

18      A.  When you say form -- you know techs go to the home for

19  a variety of different reasons. There's initial install, is

20  that what you're asking about, the initial installation?

21      Q.  Yes.

22      A.  So there is an acknowledgement for the subscribers

23  provided, I don't remember the specific wording, but the

24  subscriber is asked to sign and acknowledge that they have

25  received the subscriber agreement.

1    Q.  Can you recall providing affidavits in any other cases

2    where there was an issue surrounding arbitration?

3    A.  I don't believe I have.

4             The Witness:  Can we take a bathroom break?

5             (Whereupon, a break was taken.)

6    Q.  Ms. Dzjuna, I know that the paragraph 15 of the

7    subscriber agreement says that the arbitration will be with

8    the American Arbitration Association under its  commercial

9    arbitration rules. I think I have a copy of those here. There

10   are actually two, there's one sort a summary and one is sort

11   of the bigger rules, but I'll --

12            MR. HOPKINS:  Can you mark these.

13            (Whereupon, arbitration rules were marked as

14         Plaintiff's Exhibit 5 for identification.)

15   Q.  Ms. Dzjuna, I've marked as Exhibit 5, this is just a

16   five page document, which appears, though it says "commercial

17   arbitration rules of the

18   American Arbitration Association", it appears to only be a fee

19   schedule. Are you familiar with this document?

20   A.  No.

21   Q.  Do you have any knowledge or information about the

22   fees that have to be paid in connection with an arbitration

23   Time Warner and one of its customers?

24   A.  No.

25            MR. HOPKINS:  Mark this as six.

1          (Whereupon, rules and procedures were marked

2          as Plaintiff's Exhibit 6 for identification.)

3     Q.  Ms. Dzjuna, I'm handing you Exhibit 6, this appears to

4  be the American Arbitration Association commercial

5  arbitrations rules and procedures. Have you ever seen this

6  document before?

7     A.  No.

8     Q.  Are you familiar with this document?

9     A.  No.

10    Q.  Would it be safe to say you're not familiar with the

11  procedures of an arbitration if a customer or

12  Time Warner proceeded to that tribunal to resolve a dispute?

13    A.  Correct, I'm not familiar.

14    Q.  Do you have any information about the amount of money

15  or cost it would be necessary to expend for either party on an

16  arbitration?

17    A.  No.

18    Q.  In looking at paragraph 15 of the subscriber

19  agreement, would you agree that it does not appear that Time

20  Warner agrees to pay the customer's attorney's fees if the

21  customer prevails.

22    A.  I don't know, I'm not familiar with that. I'd have to

23  read through to see if that's correct.

24          MR. THIER:  And I would just retroactively

25          object it mischaracterizes the provision.

```
 1      Q.  I'm happy to let you read it and you tell me if you

 2   see anything -- I know there's a sentence that says that Time

 3   Warner will pay any fees required under the law, but aside

 4   from that, are you -- please tell me if you see any provision

 5   in this arbitration agreement in which Time Warner agrees to

 6   pay the attorney's fees of the customer if the customer

 7   prevails?

 8      A.  (Complying) In reading this section -- subsection D it

 9   speaks to whether the subscriber can request an advancement on

10   filing fees. That those be paid.

11           MR. THIER:  His  question was attorney's

12         fees, but of course, the agreement speaks for

13         itself.

14      Q.  I just want to make sure that I'm not missing

15   something or that you don't see that in there?

16      A.  I don't know see it, but, not be being familiar with

17   the agreement, not having written it, I don't want to say

18   absolutely -- I don't see that it speaks to that.

19      Q.  Do you know how many customers have gone to

20   arbitration with Time Warner Cable in the past three to five

21   years?

22      A.  I don't have the exact number, I think it's very few.

23      Q.  Less than 50?

24      A.  I think absolutely, yes.

25      Q.  Less than 25?
```

1        A.  It may be even less than ten.

2        Q.  Less than ten. Okay. Is there someone at

3    Time Warner with whom you spoke about that?

4        A.  I surveyed attorneys in our office that I believe

5    would normally -- potentially be exposed to an arbitration

6    case, to see if they may have handled that.

7        Q.  Do you recall the name of the that person?

8              MR. THIER:  I think she said attorneys.

9        A.  Do you want the names of each of those attorneys?

10        Q.  Are they in the legal department?

11        A.  They are in the legal department.

12        Q.  Then no. Is there one lawyer in the legal department

13    that may have more responsibilities than others, be a primary

14    point person for customer disputes or arbitrations or customer

15    lawsuits?

16        A.  Not to my understanding. I think that there are types

17    of cases that are generally handled by several different

18    lawyers, depending on their workload. We have two attorneys

19    that tend to get, I think, more of the subscriber complaints

20    than others.

21        Q.  Who would those two be?

22        A.  One of them, Jae-Min Han. And the other is Bryan

23    Goldberg.

24        Q.  Do you know whether those two lawyers, or anyone in

25    the legal department, maintains records related to -- well,

1    number one customer lawsuits, and number two, customer

2    arbitrations?

3         I mean I'm sure they maintain thousands of customer

4    lawsuits. But, do you know whether they generate any type of

5    monthly reports regarding the numbers or types of lawsuits?

6    A.  I don't know if they generate monthly reports.

7              MR. THIER:  Not on status, but rather, a

8         tally is what you're looking for, right?

9              MR. HOPKINS:  Right, right.

10             MR. THIER:  Are you aware of any reports

11        that just list how many arbitrations or lawsuits

12        there are?

13   A.  I'm not aware of any reports. I mean like you said, we

14   have files and we have records we can consult for those

15   numbers but I don't think those tallies are reported.

16   Q.  I'd like to talk to you about if a customer does not

17   pay their bill, or becomes delinquent, I'm assuming that -- I

18   know that the agreement gives Time Warner the right to

19   terminate the service, to cut their service off if they don't

20   pay their bill; is that correct?

21             MR. THIER:  I'm gonna allow her to answer

22        because I have a feeling that you're close to

23        through, but it is beyond the scope of the

24        30(b)(6) agreement, but as long as we're not

25        going to --

1    MR. HOPKINS:  Yeah, I'm going to get to the

2        point.

3        MR. THIER:  -- go to too far. You can

4        answer. Do you need the question again?

5        THE WITNESS: No.

6    A.  I think what I can say is that I know our subscriber

7    agreement provides that we can terminates for any reason.

8    Q.  What other steps -- what then, will Time Warner do if

9    they do not receive payment from a customer?

10    A.  I'm not involved in those decisions about terminating

11    customers, so I can't speak to the steps that lead up to that.

12    Q.  Do you know after a service is terminated, if a

13    customers till refuses to pay the bill, do you know what steps

14    Time Warner may take then to collect their money?

15    A.  Again, I'm not specifically, directly, involved in

16    that. I know we have collection agencies that help to try to

17    collect that debt.

18    Q.  Time Warner -- these are companies -- outside

19    companies that Time Warner contracts with to collect the debt?

20    A.  I don't know, specifically. We may have in-house

21    collection personnel, but we also probably contract outside. I

22    just don't know specifically.

23    Q.  Would you agree with me, then, that Time Warner, on

24    occasion, uses a means other than arbitration to resolve a

25    dispute with a customer?

1      A.  Yes, I would say that we use other means to try to

2  resolve disputes.

3      Q.  And you were right -- you raised a point on 17, I

4  think, paragraph 17B of this agreement says that Time Warner

5  can terminate the service at anytime for any reason or even no

6  reason.

7          Does the customer have the same right or contractual

8  right? Can they terminate their service at anytime for any

9  reason or for no reason, without notice?

10     A.  I believe that's correct.

11     Q.   Is there a penalty involved if they were to terminate

12  their service?

13     A.  Not that I'm aware of, but I'm not familiar

14  with -- we have a variety of different types of agreements.

15  There might be other service agreements that I'm not familiar

16  with, like our commercial -- I'm just not familiar with all

17  the agreements.

18     Q.  Who would be the person in Time Warner with that? With

19  any penalties or notice provisions required of customers to

20  give notice to terminate their service?

21     A.  I'm sure there are lawyers in our law department that

22  have familiarity with that.

23             MR. HOPKINS:  Mark this please.

24             (Whereupon, responses to requests for

25         production were marked as Plaintiff's Exhibit 7

```
 1            for identification.)
 2      Q.  Ms. Dzjuna, these are the -- this is the
 3   Time Warner's responses to our request that they produce
 4   documents and I just wanted to ask did you play any role in
 5   helping to find or produce documents for
 6   Time Warner in response to those requests?
 7      A.  Yes.
 8      Q.  And did you do anything other than what we have
 9   discussed earlier? I believe you indicated that you spoke to
10   the training department and the customer care department and
11   couple of lawyers in the legal department, and of course, I
12   know that you checked your own records for the numbers of
13   opt-outs?
14            MR. THIER:  And the local South Carolina
15         office.
16            THE WITNESS: Right.
17      Q.  Anything else that you can recall that you did to look
18   for or search for documents responsive to those requests?
19      A.  No, I think that that covers everything.
20            MR. HOPKINS:  Mark that.
21            (Whereupon, documents produced by Time
22         Warner were marked as Plaintiff's Exhibit 8 for
23         Identification.)
24      Q.  Ms. Dzujna, I'm handing you what we've marked as
25   Exhibit 8, which are the documents that were produced by  Time
```

1   Warner in response to our request. Are these  documents that

2   you gathered or complied to produce?

3       A.  Yes, they appear to be.

4       Q.  Did you get these documents from anyone other than the

5   person in South Carolina?

6               MR. THIER:  Maybe you have to read through

7           them.

8       Q.  They appear to all be customer documents with the

9   exception of one. This order from the State of California,

10  other than that, they all appear to be customer documents,

11  customer bills, customer service agreements. Did you get all

12  of those from your person in South Carolina?

13              MR. THIER: Other than the court order?

14              MR. HOPKINS: Right.

15      A.  On this last page, I don't think that was part of --

16  -- I'm not, sure where that came from.

17      Q.  That appears to be standard -- or is that a standard

18  form document that you all would use?

19      A.  It appears to be, I just don't think it was included

20  in-- I just don't remember seeing it in the documents which we

21  produced recently.

22              MR. THIER:  She's referring to the document

23          labelled TWC22.

24      Q.  Excluding 22 and --

25      A.  And the order.

1    Q.  And TN, which is the order, did all of the remaining

2    documents come from South Carolina?

3    A.  Yes.

4    Q.  Do you know where the court order came from? Did you

5    get that, or is that something the lawyers got from a person

6    other than you?

7    A.  I don't know where that came from.

8    Q.  You did not provide that do counsel?

9    A.  I do not recall providing that to counsel.

10   Q.  And let's talk about document 22, you did not provide

11   that document either?

12   A.  Not recently. I -- it's possible I did in the past. I

13   don't recall when that might have been.

14   Q.  Can you tell me what this form is? Are you familiar

15   with it?

16   A.  It does look like a version of our work order. I don't

17   know if this is the most current version. It may be.

18   Q.  A work order. Would this be for a new installation,

19   for a new customer? Or would it be for an existing customer

20   who needed some additional service or  repair?

21          MR. THIER: Objection to form, it's compound.

22   A.  I'm not sure, it looks like the installation work

23   order. I believe it is. I just haven't looked at it in a

24   while.

25   Q.  Do you know when the installer goes to the home do

1    they actually give a physical copy of the subscriber agreement

2    to the customer, or simply a form that tells them how to read

3    it online?

4            MR. THIER:  Just object, asked and answered,

5        but you can tell him again how it works.

6    Q.  You may have told me already. I remember the welcome

7    kit but I couldn't remember if you told me --

8    A.  Yeah, at the installation there's a welcome kit which

9    includes the subscriber agreement, it's provided to them.

10    Q.  The number of customers you said -- the total

11    customers for Time Warner, not by business line, you thought

12    was 50 million or 15 million?

13    A.  15.

14    Q.  15 million.

15    A.  Somewhere around there.

16    Q.  Is there a geographical area or is Time Warner a

17    nationwide company?

18            MR. THIER:  Objection to form.

19    A.  We service many states around the country.

20    Q.  Are there any states right now in which

21    Time Warner does not provide internet or cable service?

22    A.  Yes, I just don't have a lists of those states.

23    Q.  Do you know how many there are?

24            MR. THIER:  How many states where they do or

25        where they don't?

1          MR. HOPKINS: Where they do not. I would

2      imagine that would be a much smaller number than

3      where they do.

4          MR. THIER:  I'm not so sure about that.

5    A.  I'm just not sure. I don't want to guess.

6    Q.  The attorneys with whom you spoke that told you there

7  were probably less than ten consumer arbitrations, did you say

8  that that would be either be

9  Mr. Goldberg or Mr. Han.

10   A.  It's Ms. Han

11   Q.  Ms. Han, I'm sorry.

12   A.  Well, I think what I had said was that they were two

13  of the lawyers that I had questioned and also the two lawyers

14  that I most often see deal with subscriber related complaints.

15   Q.  Do you know whether all -- let's just assume it was

16  ten, five to ten. Do you know whether they were all arbitrated

17  at the American Arbitration Association, or through some other

18  tribunal?

19   A.  I don't know. I believe the American Arbitration

20  Association was involved in those cases, but I don't know for

21  sure.

22   Q.  To your knowledge, is Time Warner currently working on

23  any amendments to the subscriber?

24   A.  Not to my knowledge.

25   Q.  The corporate office that you referred to today, in

1   Charlotte, are there folks there, is that a regional office or

2   do those folks have some national responsibility? In other

3   words, I think you mentioned maybe a training person down

4   there. Would be they just be training for the southeast, or

5   would they be training folks nationwide?

6       A.  My understanding is that they help provide training

7   for any area of the company that might need assistance in

8   training.

9       Q.  Ms. Dzjuna, I believe that's it. If we could take a

10  short five minute break and let me speak with Mr. Hinson on

11  the phone and I think he has a few questions that he wants to

12  ask you and then we'll wrap it up, if that's okay.

13              (Whereupon, a break was taken.)

14  EXAMINATION

15  BY MR. HINSON:

16      Q.  Can you hear me, Ms. Dzujna?

17      A.  Yes.

18      Q.  My name is Brink Hinson and I represent Mark Cox and

19  Riddick Richardson in the matter that Mr. Hopkins has been

20  asking you about.

21      A.  Okay.

22      Q.  And I'll try my best not to ask the exact same

23  questions he had but I do have a few follow-up questions and

24  some of them are along the same topics as what

25  Mr. Hopkins was speaking with you about.

1          I want to go back to the fist line of questions, which

2     was your your job title, and I understand that you're the

3     senior director of compliance and legal affairs. Could you go

4     into a little more detail for me, as to what your job duties

5     are? Often I will preface that with, if you and I met and I

6     asked what exactly do you do at Time Warner, how would you

7     explain your job?

8          A.  So presently, I would say a good portion of my job is

9     related to my ethics and compliance role, so I work directly

10    with our chief ethics officer to administer this company's

11    standards of business conduct, which is a set of rules by

12    which employees are given instruction on how to conduct

13    themselves in their day to day jobs.

14          And that includes training the employees, conducting

15    investigations if there's a potential violation of the

16    standards, sending out communications, and other related

17    tasks.

18          And outside of that role, I handle a variety of

19    different responsibilities, some of which I enumerated before.

20    I work closely with our chief privacy officer  on privacy

21    related issues.

22          I have two paralegals that report to me, so I  assist

23    them in their duties. I help facilitate the roll out of new or

24    amended subscriber agreements and manage the arbitration

25    opt-out provision. I manage a program that deals with online

1    copyright infringement issues, regarding or subscribers.

2    Outside of those -- those are the big categories of

3    things, but, you know, just like any other law department,

4    where there's a need for some sort of work to be done, I can

5    handle a variety of different things, as asked.

6    Q.  And one of the things you mentioned was with regard to

7    the roll out of new subscriber agreements, correct?

8    A.  Yes, correct.

9    Q.  And what role would you play in that task?

10    A.  My role is really to act as the liaison between the

11    lawyers who prepared the agreement or any amendments and the

12    local offices who need to be made aware that there is a new

13    agreement or an amendment and if there is any instructions

14    about how to provide those in the welcome kit, or make

15    subscribers aware of them, I help facilitate making sure that

16    that gets done.

17    Q.  So when there have been new or altered subscriber

18    agreements you have been involved in the communication with

19    the local Time Warner offices as how to make customers aware

20    of those changes to subscriber agreement?

21    A.  Yes, I have played a role in making sure that the

22    local offices implement them in the way that the lawyers

23    intend.

24    Q.  Okay. And so when you do that, are there training

25    material you provide to the local offices on that topic?

1  A.  No. There is a no training that I have provided.

2  Q.  And how is your -- how is that task accomplished,

3 then? Are there phone calls, do you travel to the local

4 offices, what types of things do you do to make sure that the

5 local offices are on board with the new subscriber agreements?

6  A.  Phone calls, certainly. Usually I'm the point person

7 if the local offices have questions about how they're supposed

8 to implement, then I will sort be the point person and

9 communicate back with the lawyers if I need help in answering

10 those questions.

11  We have sent out the new agreement or amendment to the

12 local offices by e-mail so that they have the latest version.

13 I make sure that the website where WE place the subscriber

14 agreement is always updated with the most current version.

15  Q.  And let me ask about the different versions. In one of

16 the files with the court in this case, we received some

17 exhibits and one was the residential services subscriber

18 agreement in effect November, 2012, one was the same document

19 in effect August, 2007, and I'm sorry I'm not going

20 chronologically, the third was the same document in effect

21 September, 2011. Are you familiar with each one of those three

22 documents?

23  A.  Well, I don't have them in front of me. I think one of

24 the ones which was dated 2010 was one of the exhibits that was

25 marked today. I mean, generally, I have seen the various

1    versions throughout the years.

2        Q. Okay. Well, and that was -- how often has this

3    document changed? I have three right now in front of me from

4    2007, 2011, and 2012. Are there other versions between those?

5                MR. THIER:  Objection to form. And are you

6            representing in your question that those three

7            forms of the agreement are, in fact, different?

8            I'd just object to the form.

9        Q. Let me ask the question this way. Ms. Dzujna, how many

10   times since you have been working with

11   Time Warner have the subscriber agreements been changed in any

12   way?

13       A. It has been amended several times, but off the top of

14   my head I don't want to guess as to the exact number of times.

15       Q. Can you estimate? Was it more than ten?

16       A. No.

17       Q. When was the most recent time that it was amended?

18       A. In 2010.

19       Q. In 2010?

20       A. Correct.

21       Q. And do you know what changes were made in 2010 from

22   the prior version?

23       A. As I think I said before, I know for sure that the

24   arbitration opt-out provision was added because I was tasked

25   with making sure that we had a mechanism for subscribers to

1    submit those requests. I believe there were various other

2    revisions, but because I wasn't involved with the drafting I

3    can't speak to how many or the specificity of those revisions.

4        Q.  So customers who were existing customers in 2010 who

5    -- how were the changes to the residential subscriber

6    agreement brought to their attention?

7        A.  So in 2010, we communicated with our local offices

8    that they needed to make sure that the new subscriber

9    agreement was placed in any welcome kits. We instructed those

10   offices, also, to make sure that a notice was placed on the

11   all subscribers' bills for one billing cycle, letting them

12   know that there was a new version, where they could find it

13   online, and that it had an arbitration opt-out provision.

14       Q.  And what you're speaking of, this is what appears kind

15   of on the right-hand margin of some of the bills that have

16   been provided in the discovery. Is that what you're speaking

17   of?

18       A.  You want to give me a minute to look for it? I

19   believe it was in the right-hand margin.

20       Q.  Sure. I'm looking at, for instance, TWC-M and then a

21   bunch of zeros, 13.

22       A.  Okay, I can get to that page. Yes, the second

23   paragraph.

24       Q.  And so that was the notice to existing customers that

25   the arbitration clause had been added to the user agreement,

1  to the subscriber agreement?

2     A.  Well, it's a notice to them that there is an amended

3  subscriber agreement that includes an arbitration opt-out.

4     Q.  Does that paragraph there represent the only written

5  notice that existing customers got about the change to the

6  being residential services subscriber agreement?

7     A.  Well, I don't know that I can speak in absolutes on

8  that. I mean, we instructed our local offices to make

9  subscribers aware by placing this notice on their bill.

10 Making sure it's in welcome kits, I made sure it was updated

11 online.

12    Q.  But the welcome kit would be for new customers,

13 correct?

14    A.  That is correct.

15    Q.  And so for existing customers, to your knowledge, this

16 paragraph we're looking at on TWC-M13 was the only written

17 information given to existing customers as to this arbitration

18 opt-out clause?

19    A.  Well, I guess I would add to that that our work order,

20 when you have an in-home visit, I believe also in that

21 language it addresses the subscriber agreement and the

22 arbitration opt-out provision.

23    Q.  Okay. But in order to get that, the customer would

24 have to have needed -- the existing customer would have had to

25 have some sort of problem that requires work to be done at his

1    or her residence or business, correct?

2        A.  I don't think it's always a problem that requires

3    that, but yes, it would be an in-home visit.

4            MR. THIER:  It could be a service upgrade?

5            THE WITNESS: Correct.

6        Q.  In order to get what you're speaking of with the  work

7    order, there has be to some sort of reason for the Time Warner

8    service person to come out to the home?

9        A.  Yes, that's my understanding.

10       Q.  So, to your knowledge, there wasn't a campaign to send

11   customers any type of mailing separate and apart from this

12   part of the bill that we're looking at,

13   TWC-M13, informing customers about the arbitration opt-out

14   policy?

15       A.  Our instructions to the field was to inform

16   subscribers by placing this notice on their bill.

17       Q.  And nothing else, to your knowledge?

18       A.  Nothing else to my knowledge.

19       Q.  And I want to ask about the welcome kit. My

20   understanding of how it works is a new customer  arranges to

21   purchase Time Warner cable and internet service and is going

22   to require some sort of service technician to come out to the

23   home or business; is thar correct? Or to turn it on?

24       A.  Yes. I don't believe every install requires a home

25   visit, but I don't have information about which installs

1    requires home visits and which ones do not.

2        Q.  Would you say that typically there is a home visit?

3        A.  Yes.

4        Q.  And so there is a welcome kit given to the customer,

5    correct?

6        A.  Correct.

7        Q.  All right. And what is comprised -- what is that

8    welcome kit comprised of?

9        A.  I don't know, specifically, it's a variety of

10   documents. I know I've seen, certainly, the subscriber

11   agreements, the subscriber privacy notice, I don't put those

12   together so I don't know all the other documents that are

13   included.

14       Q.  Okay. Who at Time Warner -- if we wanted a copy of

15   what the welcome kit is made up of, who at

16   Time Warner could put that together for us, who would be the

17   best person to ask?

18       A.  Honestly, I'm not sure who's ultimately who's

19   responsible for providing direction on everything that should

20   be included.

21            MR. THIER:  But if you wanted to know what

22        was the in the South Carolina welcome kit?

23            THE WITNESS: In this case, we reached out to

24        local personnel in customer service who provided

25        a copy of the welcome kit that was at issue in

1          this case.

2     Q.  And that would be have been the documents given to a

3  new subscriber when the technician came out to the home?

4     A.  Correct.

5     Q.  I think you said you're not sure what, if any,

6  training the technician receives as far as how to present this

7  information, this welcome kit to the customer?

8     A.  It's just not an area that I'm involved in, so I don't

9  have that information.

10     Q.  Do you know when the welcome kit is presented?  Is it

11  at the beginning of the -- when is it supposed to be

12  presented, I guess I should say. Is that when the technician

13  first arrives, when he's leaving, do you have any information

14  on that?

15     A.  I do not.

16     Q.  And what are the ways that a new customer can contract

17  for new service?

18     A.  I don't want to speculate, and I don't have direct

19  knowledge of those methods.

20     Q.  Okay. Would you agree with me that one of the ways

21  that a new customer can contract new service is by walking

22  into his or her local Time Warner office and say I'd like to

23  get cable and internet at my home?

24     A.  Sure. They could go into a local office , they could

25  call us, they may be called by sales representative.

1    Q.  Could they -- those who have internet, could they go

2    on the internet go to one of the chat functions within the

3    Time Warner website and make arrangements with the Time Warner

4    representative over one of the chat services that they have to

5    have service started?

6    A.  I don't know specifically if that's a method, I would

7    imagine, yes, but I don't know. I don't have direct knowledge.

8    Q.  Ms. Dzujna, I want to ask you, do you have a copy of

9    -- there's some interrogatories that we had sent,

10   Mr. Hopkins and I had sent and I there may be a copy of them

11   on the table, there.

12          MR. THIER:  Yeah, it's Exhibit 3. I put it

13       in front of the witness.

14          MR. HINSON: All right. Thank you.

15   Q.  I want to look at interrogatory number six on page

16   five, and the interrogatory reads "since November 1, 2010, how

17   many Time Warner high-speed internet and/or  cable television

18   customers have engaged in arbitration with Time Warner?" And,

19   you don't know the answer to that question sitting here today,

20   correct?

21          MR. THIER:  Objection, asked and answered.

22       Not with precision. She testified less than ten

23       and  none to conclusion, but go right ahead and

24       answer him again.

25   A.  Yeah, that is what I had said earlier. It was a small

1    amount and none have gone to conclusion.

2        Q.  And the same question for interrogatory number seven,

3    you don't know -- well, the results -- maybe you do know the

4    results since none of them have been concluded, correct?

5        A.  That is my understanding, yes.

6        Q.  Let me ask you -- from the job description that you've

7    provided me, one of them was maintaining the record of the

8    customers who have opted-out of the arbitration; is that

9    correct?

10       A.  Correct.

11       Q.  And do you have -- I guess I'm trying to reconcile

12   that in my mind with the rest of your job description with

13   ethics and legal compliance, how that came to be one of the

14   hats that you wear in your job?

15       A.  Well I've been with the company almost 17 years and I

16   was hired as a paralegal, and I have worn many hats and some

17   of those hats have stayed with me regardless of other changes

18   in responsibilities.

19       Q.  And how do you maintain that list of the folks who

20   have opted-out?

21       A.  Well, there's two ways that subscribers can opt-out.

22   One is via an online opt-out form. At the time that we created

23   that mechanism, I worked with our web services team to create

24   that page, and they agreed to take on the task of compiling a

25   list of the people who submitted those through our online

1    opt-out form and they pushed those to me automatically every

2    month, a report that lists those requests. Customers can also

3    mail in their arbitration opt-out request to us and those come

4    directly to my office and I maintain a list of those mailed in

5    requests.

6        Q.  So you have some type of list of both of those, right?

7    The people or customers who have opted-out both, by letter and

8    by internet, correct?

9        A.  Correct.

10       Q.  And do you know what percentage of new customers

11   choose to opt-out by either one of the two options or methods?

12       A.  I do not. I think in my responses the numbers have

13   been provided, so I guess you can do the math based on the

14   number of actual subscribers we have.

15       Q.  We can take -- we have 1800 who have opted-out via the

16   internet option, plus 51 who have opted-out in writing and

17   then compare that with 15 million customers, correct?

18       A.  Well, 15 million customers are not new customers.

19       Q.  Okay. But as far as the total number of customers, who

20   have in some way or another opted-out, is that approximately

21   1851?

22       A.  Approximately, yes.

23       Q.  And so of the total number of Time Warner customers --

24   the percentage of Time Warner customers who have opted-out,

25   one way or another, we can look at 15 million customers and

1   approximately 1851 opt-outs, correct? That would be a way to

2   calculate that?

3       A.  Yeah, I guess if you choose to calculate it that way,

4   that would be a way.

5       Q.  Well, do you have any other way that you  -- if

6   somebody at Time Warner says to you "Ms. Dzujna, I need to

7   know what percentage of our customers have opted out of the

8   arbitration clause" how would you go about figuring that out?

9               MR. THIER:  She'd grab a calculator and do

10              the math, which you could do too, so I object to

11              the form too.

12              MR. HINSON: I'm just making sure that the

13              numbers she would use is 15 million and 1851.

14              MR. THIER:  Yes but I think she said 15

15              million was a rough approximation, but yes, total

16              subscribers as compared to 1851; is that right?

17              THE WITNESS: Correct.

18      Q.  I just want to make sure I'm using the right numbers

19   here. Thank you, Ms. Dzujna, I wasn't asking for you to do the

20   math.

21          Does Time Warner, to your knowledge keep any hits,

22   like records, of how often their website is looked at? Just

23   their website in general?

24      A.  I would imagine we do, yes.

25      Q.  Do you know if they keep that information for how

1  often the online subscriber agreement is used?

2      A.  I don't know, specifically, I've never asked for that

3  information.

4              MR. THIER: Do you know whether they can do

5          that?

6              THE WITNESS: I believe they can. I think

7          that kind of information about hits to our

8          website is very helpful and I can imagine they do

9          have that information by page and even by

10         specific documents. But  I have no information

11         about how much detail they go into.

12     Q.  With Time Warner, what department do you think would

13  be able to gain or maintain that information?

14     A.  Probably a combination of our communications

15  department that decides what our website should look like and

16  our web services team that is in charge of all the

17  implementation and design.

18     Q.  In order to be a Time Warner customer do have to leave

19  a bank account or a credit card number on file with Time

20  Warner?

21     A.  I have don't specific information on that.

22     Q.  Do you know when the arbitration clause first appeared

23  in the subscriber agreement?

24     A.  My understanding is that it first appeared in the 2010

25  amendment.

1        I'm sorry. Let me just back up for a minute. Did I

2   hear your question right? Did you ask about the arbitration

3   opt-out provision?

4        Q.  I was actually asking about -- thank you for checking

5   with me. Do you know when a mandatory arbitration clause --

6   strike that.

7        Do you know when the arbitration clause first appeared

8   in the subscriber agreement?

9        A.  I don't want to speculate. I know it's been a number

10  of years. I don't know when at the first appeared.

11       Q.  Okay. Were you -- do you recall if you were working

12  with Time Warner? Well, let me ask you this way.

13       Did you have any involvement in the roll out of the

14  subscriber agreement when it first contained the arbitration

15  clause?

16       A.  I think so, but just because I'm not sure exactly what

17  year it first appeared, I don't want to say yes for sure.

18       Q.  Initially there was an arbitration clause, and then

19  there was an arbitration clause with an opt-out provision; is

20  that accurate?

21       A.  Yes.

22       Q.  And were you involved in the roll out of the

23  subscriber agreement that first contained the opt-out

24  provision?

25       A.  Yes.

1    Q.  Do you have any knowledge of what the reasoning was to

2    include a opt-out provision?

3    A.  I wasn't involved in those discussions.

4    Q.  But do you have any knowledge of it?

5    A.  No.

6    Q.  All right, Ms. Dzujna, I think I'm done. If we could

7    just take a brief recess, I would like to speak to to Mr.

8    Hopkins one I'm more time and I appreciate your cooperation in

9    answering my questions.

10            MR. THIER:  Bill is leaving the room.

11            (Whereupon, a break was taken.)

12    Q.  All right. Ms. Dzujna, I have nothing else at this

13    time and, again, I thank you  for your cooperation and if Mr.

14    Hopkins has anything I'll pass the baton to him.

15            MR. HOPKINS:  I just wanted to follow with

16        one. I didn't understand.  How many other

17        arbitrations there have been, less than ten, I

18        think you used the phrase "not resolved" --

19            THE WITNESS:  Not concluded.

20            MR. HOPKINS:  Does that mean that they're

21        still pending or does that they were just

22        resolved somehow without it going to a conclusion

23        in that process.

24            THE WITNESS:  I don't know, specifically, I

25        think it's probably a combo of both.

```
1          MR. HOPKINS: Some didn't get to a hearing,
2     some may still be out there  pending.
3          THE WITNESS: I believe that's correct.
4          MR. HOPKINS: Okay.
5          MR. THIER:  Just to be clear, you were
6     unable to find through your searching and
7     inquiring any final arbitration determinations
8     from any subscriber matters.
9          THE WITNESS:  Correct.
10          MR. THIER:  Thank you.
11
12          (Whereupon, the deposition concluded at
13     11:45  a.m.  )
14
15     _____
16     CHRISTINE DZUJNA

SIGNED AND SUBSCRIBED TO
17   BEFORE ME, THIS 30  DAY
      OF  May        2013.
18
19   NOTARY PUBLIC
20
21
22
23
24
25
```

```
1              I N D E X   O F   W I T N E S S E S

2

3    EXAMINATION BY                    PAGE

     MR. HOPKINS                       04
4    MR. HINSON                        46

5              I N D E X   O F   E X H I B I T S

6

7    DESCRIPTION                       PAGE

8    DEPOSITION NOTICE                 10

9    AFFIDAVIT                         14

10   INTERROGATORY RESPONSES           16

11   SUBSCRIBER AGREEMENT              20

12   ARBITRATION RULES                 34

13   RULES AND PROCEDURES              35

14   RESPONSES TO REQUESTS             41

15   DOCUMENTS PRODUCED BY TIME WARNER 41

16

17

18

19

20

21

22

23

24

25
```

```
 1                   C E R T I F I C A T E
 2   STATE OF NEW YORK )
                               :
 3   COUNTY OF NEW YORK
 4
 5        I, MELISSA HUMENNY, A NOTARY PUBLIC WITHIN AND FOR
 6   THE STATE OF NEW YORK, DO HEREBY CERTIFY:
 7        THAT CHRISTINE DZUJNA, the witness whose deposition is
 8   hereinbefore set forth, was duly sworn by me and that such
 9   deposition is a true record of the testimony given by such
10   witness.
11        I further certify that I am not related to any of the
12   parties to this action by blood or marriage; and that I am in
13   no way interested in the outcome of this matter.
14        IN WITNESS WHEREOF, I have hereunto set my hand this
15   30th of MAY 2013.
16
17                         Melissa Humenny
18
19
20
21
22
23
24
25
```